## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| CONCEPCION MIER Y TERAN, | ) | Case No.  04-21514 |
| | ) | |
| Debtor. | ) | MEMORANDUM OF DECISION |
| | ) | |
| _____ | ) | |

## BACKGROUND

Concepcion Mier y Teran ("Debtor") filed her petition for relief and

chapter 13 plan on October 8, 2004.  In her schedules and plan, Debtor valued her

2001 Chevy Blazer at $8,270.00.  At the time Debtor filed her petition, she owed

General Motors Acceptance Corporation ("GMAC") $15,607.59 which was

secured by the Blazer.  GMAC argues that the Blazer is worth $15,280.79 and

objects to confirmation of Debtor's plan due to Debtor's attempt to cram down the

secured debt under § 1325(a)(5)(B) to the $8,270.00 alleged value.

A valuation hearing was held on February 1, 2005.  At the conclusion of

the hearing, the parties were given 10 days to file closing arguments and the

matter was taken under advisement.  After reviewing the parties' briefs and the

evidence presented at hearing, the Court concludes Debtor's Blazer has a value of

MEMORANDUM OF DECISION - 1

$13,711.00. This Decision constitutes the Court's findings of fact and conclusions of law as required by Fed. R. Bankr. P. 7052, 9014.

**DISCUSSION AND DISPOSITION**

Debtor proposes to retain her Blazer and "cram down" GMAC's claim under § 1325(a)(5)(B), which states that the Court shall confirm a plan if, among other things, "the plan provides that the holder of [the allowed secured] claim retain the lien securing such claim; and . . . the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim." Therefore, the value of the Blazer is key to determining the amount of GMAC's allowed secured claim and whether the plan may properly be confirmed.

"In such a 'cram down' case . . . the value of the property (and thus the amount of the secured claim under § 506(a)) is the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 960 (1997); *see also In re Baheza*, 97.4 I.B.C.R. 109 (Bankr. D. Idaho 1997). This "replacement value" is determined by the Court on a case by case basis based on the evidence presented at hearing. *Rash,* 520 U.S. at 965 n.6. "Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property." *Id.*

MEMORANDUM OF DECISION - 2

GMAC's witness, Eric L. Payne, values and appraises vehicles for over 150 insurance companies within the Pacific Northwest.  Mr. Payne performs between 150 and 200 such appraisals each month, primarily in north Idaho.

Mr. Payne inspected Debtor's Blazer on January 25, 2005.  He evaluated the NADA (National Automobile Dealers Association) reported values for a 2001 Chevy Blazer of similar features and condition as a starting point, and indicated the "base book" value was $12,950.00.

Mr. Payne also obtained quotes from three local car dealerships on such a vehicle.  While two of the dealerships gave him general estimates (of $15,700.00 and $15,950.00) because they did not presently have such a vehicle, one dealership had a 2001 Chevy Blazer on its lot.  This vehicle had approximately 20,000 more miles on it than Debtor's Blazer.  That dealership offered its Blazer for sale at $15,995.00.

Mr. Payne explained that it was not unusual for local dealer prices to be higher than NADA book values because four wheel drive vehicles such as the Chevy Blazer are popular in the area and often sell at these higher figures.  Mr. Payne also further corroborated his analysis through online research, finding 50 other dealership listings for 2001 Chevy Blazers between $15,000 and $18,000.00 within a 1,000 mile radius of north Idaho.

To arrive at a final value, Mr. Payne averaged the three local dealership

MEMORANDUM OF DECISION - 3

figures, and then averaged this dealership figure with the NADA price, arriving at

$14,415.84.[1]

Mr. Payne testified that during his inspection of the Blazer, he noted a

minor scratch on the bumper, and he estimated it would cost approximately

$105.00 to repair the damage. Mr. Payne did not deduct that amount from his

estimate of value. The Court concludes such a deduction is appropriate.

Additionally, Mr. Payne testified that the vehicles on dealership lots did or

would likely have "dealer backing" for up to thirty days even if there were no

warranties.[2] Such backing, according to Mr. Payne, is worth between $500.00 and

$600.00. Because replacement value does not include the "the value of items the

debtor does not receive when he retains his vehicle, items such as warranties,

inventory storage, and reconditioning," *Rash*, 520 U.S. at 965 n.6, this benefit

should be excluded. Thus, $600.00 will also be deducted from Mr. Payne's

valuation.

---

[1] Mr. Payne then added $864.95, representing Idaho sales tax, and reached a final replacement value of $15,280.79. Under *Rash*, the value of items such as warranties and dealer reconditioning are not included in determining a replacement value of a vehicle a debtor proposes to retain, as she does not "receive" such value upon retention. *See* 520 U.S. at 965 n.6. The parties here did not address the question of whether sales tax should similarly be excluded, or should be included as part of what a buyer in the debtor's situation would pay to obtain a vehicle. The Court is not obligated to resolve this question in the absence of argument and authorities from the litigants. The Court concludes that, since the proponent of Mr. Payne's testimony did not establish that sales tax was properly included, it will be deleted in arriving at the Court's valuation.

[2] Mr. Payne indicated the dealership that had the similar Blazer on its lot did not offer or include a warranty.

MEMORANDUM OF DECISION - 4

Therefore, the Court finds Debtor's Blazer has a value of $13,711.00.[3]

Debtor's submissions were not as persuasive, and do not compel additional adjustment. Debtor called a local car salesman, Leo Nealy,[4] and a friend of Debtor's, David Fox. Mr. Nealy's testimony relied in significant degree on Kelly Blue Book values, which he did not verify as accurate in the local market. He admitted the book was but a "tool" that might be used to establish a starting point, and that the magnitude of "mark-up" would depend on the particular dealer and the overall used car market.

As to determining a value for the subject vehicle, which Mr. Nealy characterized as in good, not excellent condition, he indicated a Kelly "private party" value of $11,770.00 would be one place to start in offering a vehicle for sale. Importantly, Mr. Nealy indicated that the amount a dealer paid to acquire the vehicle (what the dealer "had in it") would effect the prices at which it would be offered or sold.

Mr. Fox's testimony was presented in support of Debtor's contention that the "replacement value" in this case can be based on "wholesale" values. Mr. Fox

---

[3] $14,415.84 (Mr. Payne's valuation before sales tax), less $105.00 (scratch repair) and less $600.00 (dealer "backing") equals $13,710.84, which is rounded to $13,711.00.

[4] Given its ultimate resolution of the valuation issue, the Court need not address GMAC's objection to Debtor's substitution of her witness, Mr. Nealy, for a previously identified individual without timely disclosure. That objection raises questions of Debtor's candor and her compliance with L.B.R. 9014.1, but also issues of GMAC's reliance on the originally disclosed witness in conducting discovery and preparing for the hearing. *See* Fed. R. Civ. P. 37(c), incorporated by Fed. R. Bankr. P. 7037 (addressing harmless error).

MEMORANDUM OF DECISION - 5

testified that he has the ability to purchase vehicles at "$500.00 over wholesale" through friends who are car dealers in Billings and Glasgow, Montana. Mr. Fox stated that he would be willing to purchase a vehicle on that basis and then sell such vehicle to Debtor at no additional cost. There was no competent evidence, however, regarding the wholesale value of 2001 Chevy Blazers in Montana, or their availability at auctions or otherwise to Mr. Fox's dealership acquaintances.[5] While "Debtor's situation" must be considered by the Court, and the Court may use wholesale value in appropriate circumstances, *see Nichols v. Deere & Co. (In re Nichols)*, 98.3 I.B.C.R. 61, 62 (Bankr. D. Idaho 1998), the evidence in this case does not compel the use of a wholesale or a "wholesale plus $500.00" valuation.

## CONCLUSION

Based on the foregoing and the weight of the evidence presented, the Court determines the value of Debtor's 2001 Chevy Blazer is $13,711.00. Given that value, GMAC's objection to Debtor's plan under § 1325(a)(5)(B) must be sustained. The Court will enter an appropriate form of order.

---

[5] *Rash* notes that its use of the term replacement value means "the price a willing buyer in the debtor's . . . situation would pay a willing seller to obtain *property of like age and condition*." 520 U.S. at 959 n.2 (emphasis added). There was no proof a vehicle of "like age and condition" was available though Mr. Fox's connections. Fundamentally, Mr. Fox established that he could assist Debtor in obtaining *a* vehicle at wholesale cost plus $500.00. While that is a significant benefit flowing from his friendship with Debtor, it does not establish a value under *Rash* standards for *this* vehicle.

MEMORANDUM OF DECISION - 6

DATED: February 24, 2005



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 7